The next case for argument is Tuvo v. Orange Regional Medical Center. Tuvo v. Orange Regional Medical Center Why don't you wait just a second, Mr. Diederich? Would you like to leave now, or would you want to stay and leave during the hearing? No, no, that's fine. Thank you. I just wanted to give you time. Mr. Diederich. I may please the Court. Michael Diederich, I represent the plaintiff appellant in this action. From a grant of summary judgment to the employer from the White Plains branch of the district court. Yesterday I was here on a motion to dismiss argument. Today I'm here on the late — not the same case, the later version. This is the summary judgment stage. I'd like to bring to the Court's attention a case, a decision this Court issued two weeks ago, Yang v. Navigators Group by Judges Lavalsack and Raggi. It deals with a couple issues that are relevant here, one being — Did you send us a letter yet on that? I just learned of this decision. Would you mind doing that after? I will do that, Your Honor. Thank you. It deals with one that a plaintiff can testify from his or her own information. It's not self-serving and precluded. The district court below thought that it should not consider the self-serving, quote, unquote, testimony of the plaintiff in this case, which was, I believe, clear error. That's Special Appendix page 10. The district court also viewed its role as deciding the preponderance of the evidence and that it found insufficient preponderance of the evidence. It was weighing the evidence, and that is not the district court's role on summary judgment. Weighing the evidence is a jury decision, determination. I'd like to address this case a little bit reverse chronologically, the end of the case. My client was informed that she was being terminated by Orange Regional Medical Center where she worked. The hospital asked her to work four additional weeks to help it train its successor, and the evidence is clear that my client, who received an M, when you correctly add numbers, a satisfactory performance evaluation, satisfactorily performed all the elements of her job description, she was being replaced by and asked to train one woman and then another, both clearly much less qualified for the job than she was. The hospital then, and this is in a way a minor issue, but I don't think it's that minor, the hospital gave her the option to resign and waive her civil rights claims with a severance agreement and receive her vacation pay or not receive her vacation pay, and I believe she clearly had a contractual right to vacation pay. The regional medical center brought up this policy, which I think is clearly a policy that should not have been applied, and it looked like it was maliciously and the policy provided that an employee terminated for reasons other than economic layoff or similar reasons would forfeit vacation and other benefits. I think this is important, Your Honor, because it's almost a small claim size claim, but I see this in other cases where employers are now holding employees hostage to their civil rights by saying, waive your civil rights and we'll pay the vacation pay you think you earned and accrued. It's on their wage and earning statements. And I think if you analyze it fairly, my client was invited, recruited to the hospital from outside, offered a package which included benefits such as vacation pay. The vacation policy, the Orange Regional policy, is it's not contractual, anything in their employee policy. So a person shouldn't even look there. When you do look there, I think you can fairly analyze that policy as being essentially employee, if you screw up, if you do something, misconduct, something wrongful, you forfeit. And their words are automatically forfeit, the accrued vacation time. But I think that does not mean that the employer should have the unilateral right, based upon many contractual principles, mutuality, covenants of good faith and fair dealing, to say it's totally up to us as to whether or not you get that vacation pay. We can just decide you're fired and you don't get the vacation pay. I don't think that's right contractually. And I also think in this case where my client was actually requested to work on an extra four months, four weeks, and then the policy says you have the hospital will give you the right to take leave. So my client really could have said at that moment, you know what, I'd like to take my vacation now, and then I'll work the four weeks after taking it. That would be a good faith. She could do that under their policy. So I think it's the case. But she was terminated because of her race. Regarding the vacation issue or everything else?  Everything else, Your Honor, I think this case has all sorts of evidence that a reasonable jury could find show that the acting nursing director, when she moved into the position She was the same level as my client, got moved into a supervisory role, and then orchestrated events where she would favor her friends, all Caucasian. Everybody mentioned in my brief is Caucasian except my client. Orchestrated, so my client would be forced out and her friends would take the job. Now, my client, the second aspect of the case is my client complained of race discrimination to the chief executive officer of the hospital, Mr. McCullough. I have a specific question. One of the comparators, the principal comparator that you've produced, is this Sherelle Stewart? There's an affidavit from her in the record. Not a comparator. Sherlette Stewart. Sherlette Stewart, I'm sorry. Yes. Right? Remember that name? Yeah. But she worked in food services. She wasn't at labor and delivery. I didn't use her as a comparator, Your Honor. I used her as evidence that the hospital HR department is involved in helping the hospital with what I believe is a custom and practice of discriminating against Afro-Americans. She was — Sherlette Stewart was the only Afro-American manager in food service. My client was the only Afro-American manager in nursing. And there are other nurses. Another nurse came to my client's aide, a white nurse, and said my client is an excellent manager and that the CEO Schultz's allegations are wrong. So the comparators are — no, the comparator is the people who — the two — the people who replaced my client. And there are similarly other evidence of race discrimination in her termination. And those are the two affidavits I saw, one from Stewart and one from the white woman who was also left. I don't think she was discharged. I think she resigned and then said, but they treated your client poorly. So race discrimination is many, and it starts with — it starts with as soon as Ms. Schultz took over, she berated, denigrated my client. She wouldn't talk to her, wouldn't supervise her. She gave her no help. The hospital didn't give her help. My client complained to the CEO of the hospital directly, said, I'm being treated and given less resources than all other managers. My client was the only Afro-American, as I put in my brief. It's like a schoolyard child saying, everybody's beating up on me. If the teacher knows everybody else are boys and she's a girl, we know it's gender. In this case, everyone else is white. My client's black. My client specifically complained to CEO Boutoulos's next-line direct reports, the chief medical officer and the quality assurance director of the hospital, and said race discrimination to those officials. The district court said they weren't agents of the hospital. It's like they are high-level management officials of the hospital. So that's where the part of the retaliation claims come in.  management officials of the hospital. No, no. I'll use the real title. Thank you, Your Honor. Thank you. Ms. Smith? May it please the Court. My name is Mary Smith, and I'm an attorney with Jackson Lewis. We represent Orange Regional Medical Center in this case. We do believe that summary judgment was properly granted by the district court. A review of the record, whether it's a de novo review or a review of how the district court rendered its decision, really does show that there's no material issue of fact with respect to Ms. Tubow's race discrimination or her retaliation claims. With respect to the race discrimination claim, Ms. Tubow presented no direct evidence of race discrimination. The district court properly analyzed it under the McDonnell-Douglas framework and looked at the circumstantial evidence that she presented. The district court found that she did not meet the prima facie case because she failed to establish that she was qualified for the position or that she had failed to present evidence showing an inference of discrimination. We agree that she failed to present evidence that really warrants an inference of discrimination at the prima facie level. She relied, Ms. Tubow relied on inconsistencies in the manner in which she was terminated based on her performance and in the manner in which Orange Regional replaced her after her termination. None of that evidence shows any inconsistency in Orange Regional's business practices or in her termination. The record establishes Why did you take three people to replace her? Well, Your Honor, the record actually establishes in Ms. Schultz's testimony and in Ms. Tubow's testimony that Eva Edwards was appointed the interim administrator of the Labor and Delivery Department after Ms. Tubow's termination. Ms. Tubow did work with individuals during her four-week transition on some of the projects that she had been working, but she did not, and there's no evidence in the record that she trained Ms. Edwards. Ms. Edwards had been the interim administrator of the Labor and Delivery Department when Ms. Tubow was hired, and Ms. Edwards actually had trained Ms. Tubow during her orientation to Orange Regional Medical Center. So there really is no inconsistency. They put the same person back in an interim position that had been in the interim position prior to her hire. And again, if you look at There weren't three people there. No, there were not. And if you look at the time sequence here, Ms. Tubow was hired in June of 2009. At the time of her hire, there were two hospitals. There was Horton Medical Center and Arden Hill Hospital. Those two hospitals were going to be closed and merged into one large institution, which was Orange Regional Medical Center. That occurred in August of 2011. So from 2009 until August of 2011, there was a merging of two different hospitals, the staffing in the hospitals as well as administrators, and there was movement among administrators and nursing directors from one department to the other. So there's really no Ms. Tubow has established no inconsistency in the manner in which she was terminated or in her replacement. The four-week transition period, again, Ms. Schultz testified that she asked Ms. Tubow to stay on to transition her regulatory projects. Ms. Tubow did not testify differently. These are the ones not related to her administrative duties. That is correct. Her duties as administrator, but the other projects you referenced. That is correct. Well, her administrative position, she was in charge of the nurses. She was in charge of also all the regulatory and procedural aspects of running labor and delivery if there was a regulation that required a certain specimen to be sent in a certain time period. She was responsible for making sure that there was a policy in place and that the policy was followed. So she was transitioning policies to the person during that four-week period. There's also testimony from Ms. Schultz and the CEO, Scott Petoulas, that in other departments and in other situations, administrative-level individuals had been terminated and replacements had not been in place. I think it's clear when you look at Ms. Schultz's testimony that she did not intend to terminate Ms. Tubow. She intended to place her on a 90-day PIP. Her testimony is very clear in that regard. When she met with her supervisor, the CEO, and she was an interim administrator, he directed her that we do not place administrative, executive-level team leaders on 90-day PIPs. We terminate their employment. And Ms. Tubow's employment was terminated as a result of that conversation. Mr. Petoulas testified very clearly that he supported the termination of both Ms. Tubow and the emergency room director. So we believe we've established legitimate, nondiscriminatory reasons for her termination. And we don't believe that even if you give Ms. Tubow the benefit of a lower threshold for a prima facie case, we don't believe that she's established that our reasons are false and that her evidence in this case shows – establishes pretext to warrant a trial. We – it's very clear that Ms. Tubow disagrees with our – with Orange Regional's assessment of her performance. She provides excuses. But she does admit in her deposition testimony and even in her declaration as to all of the underlying concerns that the hospital had with her. She admits there were low patient satisfaction scores in the labor and delivery department. She admits that she did not effectively cross-train all of the nurses. And cross-training the nurses was directly related to her ability to receive an additional clinical coordinator and get budget approval for that. You received very high marks in her first annual review in 2010, excellent or meeting plus, which I guess is the second highest. Yeah. And as your adversary points out in the later evaluation, it looks like it's a meets if you add the numbers differently than the administrator did. Well, Ms. Schultz, at her deposition, she did testify that she could not recall. She checked two boxes in one section. She checked the meets expectation and below expectations box. If it was a meet, the point was added. If it was below, the point was not added, which brought it to a meets minus. She couldn't test – she could not recall at her deposition exactly what she meant. But she assumed that she probably should have, you know, meant below. And that's why she came with a meets minus. But again, Ms. Schultz testified that at the time she wrote the performance review, which was in June of 2011. She started it in June and concluded it after the move in late August, that she did not intend to terminate Ms. Tubo, that she intended to place her on a 90-day PIP, that this was, you know, to provide her with the areas in which she had to improve her performance and give her time to improve it. The CEO of the organization was not willing to wait 90 days for an administrator in that department to improve her performance. And as a result, he directed his subordinate, who was Ms. Schultz, to terminate her. With respect to the – Ms. Tubo's arguments about the clinical coordinator, there is evidence in the record, both through Ms. Schultz and Mr. Petulis's testimony, as well as Ms. Tubo's, that not every department had a clinical coordinator, that in fact the nurses had asked for 15 clinical coordinators, and they had received approval for only three by 2011. And in fact, the clinical – the educator clinical coordinator position was approved from Ms. Tubo's department, and she was in the process of hiring one at the time of her termination. So she was provided with proper guidance, as well as mentoring. With respect to her retaliation claim, I'm going to jump to the pretext argument. There is evidence in the record, if you want to meet the lower threshold, that she's met a prima facie case. But there is no evidence of a causal connection between any of her alleged complaints and the decision-makers in this case, which are Ms. Schultz and CEO Petulis. There's simply no evidence that Scott Petulis had any knowledge that she had complained at any point of race discrimination or of a specific racially directed remark. His testimony is that he was repeatedly asked for budgetary approval throughout – you know, as CEO, his requests came across his desk every day, and he routinely denied them. It was always based upon a review of the production threshold in that particular department and whether the department head was meeting the production threshold. And if they were not, they did not receive approval for any additional full-time employees. What about the vacation pay? So with respect to the vacation pay, Orange Regional does have a very clear policy in its handbook that vacation is forfeited if an employee's employment is terminated. In this instance, Ms. Tubo was advised that her employment was terminated. She testified that there was no conversation with her when she met with Ms. Schultz about the four-week transition in any way related to a later conversation with her and a separate conversation with her where she was offered severance in exchange – severance which included her vacation pay in exchange for a written release. It is a practice within the hospital that if an employee is terminated, they do not receive vacation pay. And we provided to the district court evidence of other white administrative level employees who were terminated who did not receive vacation pay. The individuals that Mr. Diederich references are all plaintiffs in other litigations against Orange Regional Medical Center. None of their claims – none of their employments relate in any way to Ms. Tubo's. They reported to different supervisors, different decision makers. Human Resources just carried out a formal policy and practice with respect to Ms. Tubo and the vacation. Vacation is not guaranteed. Is it a formal policy that the hospital in every case where there is a termination makes an offer for – in exchange for a release? No, Your Honor. Not in every situation is an individual offered the opportunity to – and frequently what happens is depending on the position, the basis for the termination, and whether it's a regulated position, the individual may be offered the opportunity to transfer – to change their termination to a resignation so that the termination does not have to be reported to regulatory authorities. And in the process of doing that, they are offered a release. The release generally includes a vacation pay. But if someone is terminated and they – and the Human Resources does not make that determination to do that, then they are terminated and they do not receive – they forfeit their vacation pay. Thank you. Mr. Diederich, you have reserved some time for rebuttal. Thank you, Your Honor. My client could have here resigned and she would have received her vacation pay because she didn't resign out of protest of the racial discrimination. She did not receive her vacation pay. As to evidence, the Court needs to, under Reeves and the Teachings on Summary Judgment and Employment Law, comb the record. The record here is replete with examples that a jury will find indicate and an inference can be drawn of discrimination. Everything from the very beginning of my client's hire, recruiting her, but then not recruiting any successor. By not recruiting from the outside, the hospital was assured of having a white successor to my client. Rating her, but not on factors outside of her job description, and never discussing with her the criticisms. And lastly, not – going to the end of her employment, not giving her that three-month PIP. The hospital policy is progressive discipline. My client received no progressive discipline whatsoever. She successfully handled the move. The administrator in the emergency room department, the emergency room services department, also did not receive a PIP at about the same time. Same time. And you're on the side. Is that right? I'm just making sure I understand the record correctly. I don't know if she received it. I think she was fired. I don't think she received the PIP. But the policy Ms. Schultz was to give it, and it's clear here. I think the point out of that is there's another person who was fired, terminated, who did not receive a PIP. So what's your point? You say everybody has to receive a PIP? Well, Ms. Rindberg was supportive of other employees' rights. And they're not comparators. I think it's – I don't think everybody needs to have a PIP. And Ms. Rindberg, I think, was hostile to the administration. My client was not. So if you're hostile, you don't need a PIP. But the practice of Ms. Schultz was to give a PIP. And it's easy to see why one was not afforded her here with Mr. – by CEO Boutoulos. And that is my client successfully handled her job of safeguarding patients in the hospital from the two old, decrepit institutions to the new medical center. Patient satisfaction scores would be based upon being in an old, decrepit center. Now they're in a new center. It is easy to – But didn't she admit that the scores had not gone up? Your Honor, the scores had never gone up prior to her being hired, and it wasn't part of her performance evaluation. It's outside of her control as a nurse. She didn't – she didn't – Why is that? She's head of the Department of Labor and Delivery. She wasn't hired as an MBA, Your Honor. She was hired – If you look at her job description coming in, she was hired as a nurse for patient safeguarding, safeguarding patient safety as a nurse. What the hospital wanted regarding these amenities was patient satisfaction or customer satisfaction, even visitors. You had an old center. And also, the record's clear that Mr. Boutoulos didn't criticize or find reason to discipline or criticize my client because of all the factors that she explained to him that prevented her from achieving various things. For example, her people were union. There's only so much she could do. And she was handling all this single-handedly without an aide. If she had been given three more months with the new assistant, she could have had everything work fine and satisfied all their – not only the job performance requirements, but also these additional performance. But by getting rid of her right after the move, it prevented her from proving herself if she needed to prove herself. And I don't think she did need to prove herself because she did fine.